**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
**UNITED STATES OF AMERICA** )
)
     **V.** ) No, 25-cr-10238 DJC
)
**MICHAEL MAHONEY, DEFENDANT** )
_____)

**REPLY TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

**Introduction:**

At the time the undersigned prepared and filed the sentencing memorandum on behalf of Mr. Mahoney, the government had not provided its sentencing recommendation. The undersigned seeks to respond to the government's memorandum herein.

**Issues Presented:**

Whether the probation department accurately calculated the sentencing guidelines for this case.

Whether the government has waived objections to the guideline calculations as set forth in the final PSR.

Whether the enhancement set forth in USSG 3A1.2(b) is applicable to the defendant and the facts of this case.

Whether a period of home detention is an appropriate sentence considering the totality of the facts and circumstances of this case and considering the statutory mandates set forth in 18 U.S.C. 3553(a).

**Argument:**

    **Probation has accurately calculated the guidelines:**

The probation officer properly and accurately calculated the applicable guideline range.  During the preparation of the initial PSR, probation inquired of the government its view as to the motivation of the defendant in connection with the crime to which he entered a plea of guilty.  The probation officer asked the assistant United States Attorney then involved in this case, "why these threats were made".  Specifically, probation asked "I

am hoping to learn if you have any additional information as to why these statements were made."

The assistant responded as follows:

> ... I can't say we know exactly why and I am uncertain that Mr. Mahoney could say why he made the call. The victim who received the call was/is a well known litigator in his own right at a nationally known law firm who was, at the time, running for a position as the head of a prestigious bar association. I bring that up because Dr. Daignault's report indicates at several points in his life, Mr. Mahoney has became [sic] very depressed, "feeling like an unaccomplished failure in life." The combination of caring for an elderly parent, being socially isolated and not working, seems to have led to this lashing out.
>
> It has been my experience that a lot of threat cases usually include something being said that relates to what the caller sees as the issue – for example, a particular political position; something the caller feels overlooked or they're not getting, for example, a benefit or able to get treatment; a relationship gone bad. There have been many times when the investigation agents are able to find what motivated the behavior. That's not been this case other than what I have mentioned above.[1]

**The Government has waived objections to the PSR Guideline calculations and is bound by the statements made to probation as noted above.**

The government made no response to the objections raised by the defendant to the initial guideline calculations. Probation reviewed the objections of the defendant and amended the guideline calculations consistent with the objections of the defendant. Thereafter the government "disagreed with the calculations in the amended PSR in its sentencing memorandum and in doing so disregarded the response made by the AUSA then in charge of the case without any reference to those remarks. Given these circumstances, the defendant contends the government has waived any objection to the guideline range as calculated by probation. See Fed. Rules Crim. Proc. Rule 32(f). Once the final report was submitted to the parties, the government made no objection, nor did it provide any legal arguments to probation.

**The enhancement set forth in USSG 3A1.2(a) does not apply:**

The government relies on, *United States v. Davila-Bonilla*, 968 F.3d 1 (1st Cir. 2020) in support of the application of the enhancement set forth in USSG 3A1.2(a). The facts in

---

[1] These comments were made by the very experienced AUSA involved in the case from the beginning and ought to bind the government at this stage of the proceedings.

*Davila-Bonilla* are demonstrably different from this case. First, the threats were made directly to the government official because of actions taken by that government official in the performance of her duties. In that case, the victim was a probation officer supervising the defendant on an unrelated case. She insisted on him being drug tested and he threatened her because of the performance of her official duties. Id. at 11. The defendant admitted as much at his plea hearing. Id.

The government fairs no better with the remaining two cases it suggests support the application of the enhancement. Both cases are fact specific and present situations far removed from the facts of this case. First, both *United States v. Feeback*, 53 F.th 1132 (8th Cir. 2022) and *United States v. Chandler*, 104 F.th 445 (3rd Cir. 2024) involved the actual federal officials and not a relative. The *Feeback* case involved threatening by a former National Guardsman who had specific grievances against the National Guard. The defendant sent specific threatening emails to Iowa's Army National Guard and posted threats on Facebook demanding money and benefits he believed he was entitled to. In *Chandler,* the defendant robbed and kidnapped U.S. Postal employees.

In assessing the application of the enhancement in *Chandler*, the Court stated,

> "Motive is a question of fact[,]" *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006), and we review the District Court's factual findings for clear error. *United States v. Richards*, 674 F.3d 215, 220 (3d Cir. 2012). ... A defendant may be said to be motivated by a victim's status as a government employee when that status has "influenc[ed] [the defendant's] choice" to commit the crime. Motivate (def. 1) & Motive (def. 1b), Webster's Third New International Dictionary (1986); see also Motive, Black's Law Dictionary (11th ed. 2019) ("Something, esp[ecially] willful desire, that leads one to act."). Chandler argues that knowledge alone cannot trigger this enhancement. We agree. Footnote 22 omitted. ... Instead a victim's status as a government employee must have been at least part of the reason why the defendant committed the crime. Cf. *Hassan v. City of New York*, 804 F.3d 277, 297 (3d Cir. 2015) ("Motive asks … why did he do it?") (cleaned up). That status need not, however, be the only reason for the crime; multiple motives can coexist. See Motivate (def. 1), Webster's Third New International Dictionary (1986) (giving examples of "factors that [motivate] people"); *United States v. Feeback*, 53 F.4th 1132, 1135 (8th [*459] Cir. 2022) (applying the "official victim" enhancement when a defendant made illegal threats to Veterans Affairs employees regarding his benefits because "[i]t ma[de] no difference that money may have [also] played a role"). *United States v. Chandler*, 104 F.4th at 457-458.

In this case Mr. Mahoney's threatening call was not made to the public official but was made to the official's relative. It consisted of a serious, but brief threatening phone call directed at the relative, his wife and then the public official. The call lasted approximately twelve (12) seconds. A repeat call was unanswered and there were no further attempts to call or make additional contact. Early on and after receipt of

evaluations by two expert mental health clinicians, the government concluded there existed no evidence of motivation sufficient to support the enhancement due to the relative's status as the relative of a public official. The fact that Mr. Mahoney was troubled by the state of political discourse and governance is not sufficient to support a finding that the motivation for his call was totally, or even in part, the result of the victim's status as the relative of a public official.

**Probation or Supervised Release vs. Home detention:**

The government has disparaged a probationary sentence as "simply insufficient to satisfy the statutory purposes of sentencing. It imposes no real cost on conduct that is unfortunately becoming prevalent in our society. … [P]robation fails to hold the defendant accountable for actions that are antithetical to the core values of the United States."

Perhaps the best response to this argument comes from the United States Supreme Court in *Gall v. United States*, 552 U.S. 38, 57-58(2007) where the Court quoted and approved of the following language from the District Court's sentencing of the defendant to probation:

At the end of both the sentencing hearing and the sentencing memorandum, the District Judge reminded Gall that probation, rather than "an act of leniency," is a "substantial restriction of freedom." In the memorandum, he (the District Court Judge) emphasized:

"[Gall] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term." *United States v. Gall*, 374 F.2d. 758, 763 (S.D. Iowa 2007).

A sentence of probation is not a lenient sentence. As noted above, it carries significant limitations on a probationer's liberty. Sanctions may be imposed for violations. The sentence proposed on behalf of Mr. Mahoney will necessarily provide him with assistance that on his own may not be able to obtain or even be aware.

**Payment of a Fine:**

The undersigned is CJA counsel for Mr. Mahoney. Mr. Mahoney does not have the means to pay a $20,000 fine. He has been unemployed for most of the past four-plus years since returning to the East Coast from the Pacific Northwest and has largely been living off savings. He worked for Ocean State Job Lot in Dennis Port, Massachusetts, for three months this past spring/summer, making approximately $7,500, most of which has been

spent on rent, food, transportation, paying off a large debt to his father and purchasing new clothing to meet the dress code of his job. He has been employed by Nordstrom Rack in Hyannis for the past four months at a rate of $18.50 per hour, making approximately $4,900 over the past seven two-week pay periods since mid-September. Currently, he has a little over $20,000 remaining in his savings and checking accounts at Dutch Point Credit Union in Newington, Connecticut, and another $400 in his checking account at Cape & Coast Bank in East Dennis, Massachusetts. He does not own any stocks, bonds or properties, and his primary mode of transportation is a bicycle that he purchased in 2017 for $750. He has never owned a house, a car, or any form of motorized or battery-powered transportation and has never had a driver's license.

He is in the process of finding a new place to live, an apartment or small house closer to his work in Hyannis. The house he currently lives in is owned by his father, will be sold upon his departure, ideally no later than this spring. Mr. Mahoney will not see any of the proceeds from the sale of the house; they will all go to his father, to pay for his memory care facility and other ongoing health care expenses.

He currently pays his father $1,250 in monthly rent to live in the house in East Dennis that he shared with him from July 2022 to April 2024, acting as his caretaker, before he entered a memory care facility in Brookline. He is in the process of paying off a $24,500 loan to pay for the services of two medical experts, a forensic psychologist in Braintree and a neuropsychologist in Needham, money that came from his father's checking account in his Cape Cod bank. At this point, he has paid off $6,500 and has $18,000 left to go. Mr. Mahoney commutes to work in Hyannis (a 30-mile round trip) on his bike; when weather conditions make that a poor choice, he relies on public transportation and ride services, mostly Uber; He has spent more than $3,000 on transportation costs since April 2025, including bus trips and ride services to and from Boston, Leominster, Braintree and Needham. He spends between $100 and $150 per month on food and health-related expenses.  Finally he pays $180 per month for storage of some personal items and $145 per month for the monitoring of his phone and computer as per his conditions of release.

Mr. Mahoney has no criminal record.  He has no history of violence.  At the time of this offense he was suffering, as more particularly described in the evaluations previously submitted.  He was unemployed.  Since this case began he has sought counseling, is now employed and hopes to obtain income from an additional part-time position which he can perform from his home. Mr. Mahoney has learned from his experience, has sought and continues to seek a better life for himself.   A sentence of home confinement will likely result in the loss of his present job and significantly restrict his already limited ability to obtain medical and mental health counseling, secure his own housing with better access to public transportation. He has demonstrated that he is a worthy candidate for either a probationary sentence or a sentence of time served with a period of supervised release.

|  |  |
|---|---|
|  | Respectfully submitted |
|  | The Defendant, by his attorney |
|  |  |
|  | /s/ Edward P. Ryan, Jr. |
| Dated: January 13, 2026 | Edward P. Ryan, Jr., Esq. – BBO#434960 |
|  | O'Connor and Ryan, P.C. |
|  | 80 Erdman Way, Suite 309 |
|  | Leominster, MA 01453 |
|  | 978-534-1301 |

CERTIFICATE OF SERVICE

    I, Edward P. Ryan, Jr., *Attorney for the Defendant*, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

    /s/ Edward P. Ryan, Jr.
    Edward P. Ryan, Jr.